UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                          CASE NO.: 10-19383-BKC-EPK

BAINBRIDGE SHOPPING CENTER II, LLC.,[1]         CHAPTER 11
    Debtor.
_____/

**DECLARATION OF JOHN R. McGILL IN SUPPORT OF CHAPTER 11
PETITION AND REQUEST FOR FIRST DAY AND SECOND DAY RELIEF**

### I.   Introduction

1.     My name is John R. McGill. I am the President of Bainbridge Shopping Center II, LLC, ("Debtor"). In that capacity, I am responsible for the operations of the shopping center that is owned by the Debtor. I have been in that position for the entire approximately 31 months of its existence.

2.     I am also the president or managing member of over 10 other entities involved in the shopping center/mall industry, in which I have been consistently engaged for the past 40 years. One entity is the umbrella for substantially all of the operating and other entities. This entity is called McGill Property Group, LLC ("MPG"), which until 2004 was known as Heritage Development Company, LLC.

3.     MPG owns no real estate itself but controls all of the limited liability companies and corporations in which I have an interest. These other companies, on the other hand, own numerous commercial and retail buildings and land development projects throughout Florida, Kentucky, Ohio, Pennsylvania and North Carolina.

---

[1] The last four digits of the Debtor's taxpayer identification number are 7838. The Debtor's mailing address is 4425 Military Trail, Unit 202, Jupiter, FL 33458.

2739710-2

4.  I make the following statements in support of the petition, various first day applications and motions filed in the Debtor's bankruptcy case. Except as otherwise indicated, all of the facts set forth in this declaration are based upon my personal knowledge and my review of relevant documents of the Debtor. I am over the age of 18, competent to testify to the matters herein set forth and if called upon to do so, I could and would testify to the facts set forth herein.

5.  The facts set forth herein are derived from my intimate knowledge of the Debtor's business, along with my review of the Debtor's books and records, including those relating to the Debtor's financial and operating performance discussed herein.

## II. Factual Background

6.  On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

### A. Background and Corporate Structure of the Debtor

7.  The Debtor is an Ohio limited liability company organized on October 18, 2007 as a special purpose entity by the request of U.S Bank, National Association. The Debtor's members are Bainbridge Shopping Center Manager II, Inc., an Ohio corporation, which owns a 1% membership interest and McGill Real Estate Holdings, LLC, an Ohio limited liability company, which owns a 99% membership interest.

8.  The Debtor owns and operates the Marketplace at Four Corners in a southeastern suburb of Cleveland, Ohio. The shopping center is a Regional Power Center, anchored by Marshalls, Wal-Mart Supercenter, Kohl's, Dick's Sporting Goods, Babies 'R' Us, Michael's, PetsMart, and McDonald's. The total rentable square footage of the shopping center is approximately 526,175 sq. ft. In addition, there are approximately 60,000 sq. ft. of undeveloped land suitable for additional retail occupancy. Adjacent to it, and owned by an

2739710-2

affiliate company, are 60,000 additional sq. ft. of vacant land. This development serves the southeast greater Cleveland area, including the suburbs of Solon, Twinsburg, Aurora, and Bainbridge. The Center benefits from two signalized access points from State Highway 43 and has excellent visibility.

9. The current monthly rent roll is $301,474.

### C. Liquidity and Capital Structure

10. For the period ending December 31, 2008, the Debtor received revenues of $5,468,736, posted EBITDA of $544,463, and a net operating loss of $651,373.90.

11. For the period of January 1 – May 31, 2009, the Debtor received revenues of $2,088,796.07; thereafter all revenues were taken by the Lender's Special Servicer, the details about which are discussed below. The Debtor does not yet have its full results from 2009.

12. For the period of January 1 – the date hereof, the Debtor received revenues of $0 as all rents were received by the Lender's Special Servicer, the details about which are discussed below.

13. As of the Petition Date, the Debtor had approximately $37,652,641 (at book value) in assets, and approximately $45,800,000 in liabilities.

#### (i) CMBS

14. Pursuant to the Secured Promissory Note dated November 1, 2007, the Debtor borrowed $46,600,000 from U.S. Bank National Association. The note memorializing the loan has a Maturity Date of November 1, 2017, subject to earlier acceleration upon default. The note was immediately securitized and became a part of Bear Stearns Commercial Mortgage Securities Trust Series 2007-PWR 18, of which at first, LaSalle Bank served as the trustee. The original and current "Primary Servicer" of the loan was and is Principal Global Investors, LLC. When

LaSalle Bank merged into Bank of America, N.A., the latter became the trustee. Therefore, today, Bank of America, N.A. is the trustee of the Registered Certificateholders of the Bear Stearns Commercial Mortgage Securities Trust Series 2007-PWR 18 and is believed to be the holder of the note. In the spring of 2009, servicing of the loan was transferred to a so-called "Special Servicer", entitled Centerline Servicing, Inc., with whom the Debtor has been dealing since that time.

15. On or about November 1, 2007, the Lender recorded (or caused to be recorded) a real estate mortgage in the records of the Geauga County Records and on November 6, 2007 filed (or caused to be filed) a UCC-1 financing statement with the Ohio Secretary of State.

16. Upon information and belief, as of the Petition Date, there is $45,607,689 outstanding on the note.

17. Pursuant to the terms and conditions of the note, the Debtor was required to make payments on a monthly basis, beginning on December 1, 2007, until the note matures on November 1, 2017. The fixed monthly payments of principal and interest is about $292,707.32. The unpaid principal balance of the loan, together with all accrued and unpaid interest, is due and payable in full on November 1, 2017.

18. The Debtor made its payments timely until March, 2009. However, due to the bankruptcies of Linens 'N' Things and Circuit City, the Debtor missed the March 1, 2009 payment. The impact of these bankruptcies of major tenants cannot be overstated. The Linens 'N' Things bankruptcy alone reduced the yearly cash flow by $563,100, not including the utilities for which the landlord is now responsible. While the Circuit City space is not collateral for the loan, revenue from that lease was used to offset rent forgone from the loss of Linens 'N' Things. The bankruptcy of Linens 'N' Things, coupled with vacancies created by Dollar USA,

2739710-2

Inkstop, Dinners by the Dozen and Snappy Auctions reduced the cash flow of the shopping center by over $800,000 per year.

19. The Lender, through its "special servicer", implemented a lockbox arrangement as of June, 2009, which caused the tenants' rent payments to be swept from the Debtor's bank account into a bank account that only the Lender controlled. In addition, the Lender began to charge monthly late fees of $11,708.29 and increased the interest rate to 10.44% effective as of March 4, 2009.

20. On October 26, 2009, the Lender officially declared a default.

21. The Debtor has been living with the lockbox relationship, submitting to the Lender the bills for payment and then waiting for the Lender to issue and deliver to the Debtor checks for the payment of these bills. This arrangement has been prejudicial to the Debtor's trade vendors because of the delay, both inherent in the process and due to negligent performance by the "special servicer" retained by the Lender.

22. For example, despite the Debtor repeatedly explaining to the special servicer that two of the Debtor's major tenants – Wal-Mart and McDonald's – are contractually obligated to pay their portion of the real property taxes directly to the County, the special servicer went ahead and anyway paid those taxes out of the Debtor's funds, costing the Debtor $157,038.95. Only one of these tenants has since reimbursed the Debtor for the special servicer's error.

23. Also, instead of retaining a local appraiser who is cognizant of the local market conditions, and would not need to charge the Debtor for travel and other expenses, the special servicer retained an appraiser from Missouri that cost more than an appraiser would have charged and also added extra unnecessary travel and other expenses.

2739710-2

24. Further, even though the Debtor has its own management company that is doing the real work of managing the property, the special servicer is not allowing the management firm to get paid; instead, for merely taking this firm's work product and repackaging it for the Lender, the special servicer is charging the Debtor, although the Debtor has not been advised nor made aware of how much.

25. And, even though the property is already being managed competently (as best as it can be, given that the Debtor and its property manager have no access to the revenue stream without making requests for releases from the special servicer) the special servicer has requested the Debtor's consent to put a receiver in place at a great additional and unnecessary expense.

26. In my view, the actions of the special servicer have harmed the Debtor and its other creditors and even the Lender. By expending money it need not have done, including paying taxes for others, the special servicer has worsened the default on the note. When the Debtor's access to cash was cut off in June, 2009, the Debtor was only two months behind. But now, when paying the monthly mortgage payment is the responsibility of the special servicer, the payments are seven months behind. In my opinion, if the Debtor had still been in charge, the default would not have worsened, or at least not to the extent it presently exists.

27. The proverbial straw that broke the camel's back was the Lender's refusal to release funds to allow the Debtor to build the tenant improvements necessary to bring in two new tenants. As noted above, the temporary cash crunch that created the default was directly caused by the bankruptcies of two of the Debtor's largest tenants – Circuit City and Linens 'N' Things. The Debtor has worked hard to find new tenants to fill the holes that those bankruptcies left in the shopping center. Despite the unprecedented retail downtown that is devastating many shopping centers nationwide, the Debtor was successful in this difficult endeavor and has written commitments from Home Goods, a division of TJX Corp., and Five Below, Inc. to lease space in the shopping center provided that the Debtor build the tenant

2739710-2

improvements that are required to make the spaces ready for the tenants' operations. In addition, an existing tenant, AT&T Corp., has agreed to a lease amendment to occupy an additional 1,495 sq. ft. at additional rent, also contingent on the Debtor building out the space. The revenue that these new tenants will add to the Debtor's rent roll will be substantial, as depicted in the budget, (attached hereto as Exhibit "A" and incorporated herein) and when capitalized, will substantially increase the value of the shopping center, to the benefit of the Lender's bondholders. Yet the Lender, through the "special servicer", repeatedly turned down all of the Debtor's repeated reasonable requests to accommodate this build-out.

28. The Lender holds a properly perfected first position lien on all of the Debtor's assets for the approximate $45,600,000 owed to it by the Debtor.

### III. Necessity for Emergency Hearings on So-Called "First Day" Motions and for Prompt Hearings on So-Called "Second Day" Motions

29. Contemporaneously herewith or nearly so, the Debtor is filing the following motions and applications:

> a. Debtor's Application for Approval of the Employment of Berger Singerman, P.A. as Counsel to the Debtor Effective as of The Petition Date;
>
> b. Debtor's Application for Approval of Employment of Kapila & Company as Financial Advisor to the Debtor Effective as of The Petition Date;

(collectively, the "**First Day Motions**"). And the Debtor intends shortly hereafter to file these "Second Day Motions":

> c. Debtor's Motion for Authority to Use Cash Collateral.
>
> d. Debtor's Motion to (i) Prohibit Utilities from Altering Or Discontinuing Services on Account of Prepetition Invoices; (ii) Establish Procedures to Determine Requests for Additional Assurance of Payment; and (iii) Approve Deposits as Adequate Protection of Payment for Utility Services

2739710-2

e. Debtor's Motion to Establish Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals.

As more fully described below, I believe that it is necessary for the relief sought in the First Day Motions to be granted on an expedited basis and that the relief sought in the Second Day Motions be granted shortly thereafter.

## A. Applications to Retain Professionals

### i. *Retention of Berger Singerman*

30. The Debtor seeks approval of the employment of the law firm of Berger Singerman as attorneys for the Debtor, effective as of the Petition Date.

31. The Debtor selected Berger Singerman as its bankruptcy attorneys because of the firm's extensive experience with business reorganizations. Berger Singerman has extensive experience and knowledge in the field of debtors' and creditors' rights and representing business debtors in reorganization cases under chapter 11 of the Bankruptcy Code. Berger Singerman has expended significant resources working with the Debtor to prepare for the filing of this case. Berger Singerman has become familiar with the Debtor's business operations and legal obligations. Berger Singerman's appearance before this Court for the matters in this Chapter 11 case will be efficient and cost effective for the Debtor's estates.

32. Berger Singerman was not owed any fees and costs as of the Petition Date and is not otherwise a creditor of the Debtor.

33. Counsel has informed me that corporations, partnerships and limited liability companies must be represented by a licensed attorney in Florida and in federal courts. Because of the range of relief sought by the Debtor on an expedited basis, I believe that the Debtor would suffer immediate and irreparable harm if it were not able to obtain the immediate services of counsel from the outset of this case. For example, the Debtor needs to obtain authority to use

2739710-2

cash collateral. Without the availability of cash, the Debtor will not be able to accomplish the immediate goal of adding new tenants to the shopping center on a timely basis in order to preserve and increase the value of its assets for the benefit of its estate. Therefore, I believe that immediate approval of Berger Singerman's retention is critical in order to avoid immediate and irreparable injury.

### ii.   *Retention of Kapila & Company*

34.   The Debtor seeks approval of the employment of Kapila & Company as the financial advisor for the Debtor, effective as of the Petition Date.

35.   The Debtor selected Kapila & Company as its financial advisor because of its extensive experience with accountancy and cash flow analysis. Kapila & Company has expended significant resources working with the Debtor to prepare for the filing of this case and has thereby become familiar with Debtor's business operations and legal obligations to its creditors. Kapila & Company's financial assistance in this Chapter 11 case will be efficient and cost effective for the Debtor's estate.

36.   Kapila & Company was not owed any fees or costs as of the Petition Date and is not otherwise a creditor of the Debtor.

### B.   <u>Cash Collateral Motion</u>

37.   As of the Petition Date, the Debtor does not have the working capital or financing to operate its business inasmuch all of its revenues are trapped by the Lender's lockbox arrangement. While the Debtor has been trying to exist under this arrangement for the better part of a year, it is being stymied from improving its cash flow and concomitantly the value of its estate by the Lender's refusal to release funds to accommodate tenant improvements necessary to make the space available for their occupancy.

2739710-2

38. As noted above, the temporary cash crunch that created the default was directly caused by the bankruptcies of two of the Debtor's largest tenants – Circuit City and Linens 'N' Things. The Debtor has worked hard to find new tenants to fill the holes that those bankruptcies left in the shopping center. Despite the unprecedented retail downtown that is devastating many shopping centers nationwide, the Debtor was successful in this difficult endeavor and has written commitments from Home Goods, a division of TJX Corp., and Five Below, Inc., to lease space in the shopping center provided that the Debtor build the tenant improvements that are required to make the spaces ready for the tenants' operations. In addition, an existing tenant, AT&T Corp., has agreed to a lease amendment to occupy an additional 1,495 sq. ft. at additional rent, also contingent on the Debtor building out the space. The revenue that these new tenants will add to the Debtor's rent roll will be substantial, and when capitalized, will substantially increase the value of the shopping center, to the benefit of the Lender's bondholders. Yet the Lender, through the "special servicer", repeatedly turned down all of the Debtor's repeated reasonable requests to accommodate this build-out.

39. Therefore, the Debtor immediately needs the ability to use all of the cash generated from the rents. Unless authorized to use the rents received in the ordinary course of business, the Debtor will be unable to resuscitate the shopping center and to reorganize its business. Moreover, leaving the cash collateral in the hands of the Lender's "special servicer" will result in immediate and irreparable harm to the Debtor's estate due to the loss of the new tenants.

40. I am advised that the rents are "cash collateral" as that term is used in the Bankruptcy Code and that to obtain court approval for the unconsented use of cash collateral, the Debtor must provide the Lender with "adequate protection" of its secured claim. I believe that the terms and conditions set forth in the Cash Collateral Motion provide such adequate protection.

2739710-2

**C.      Request To Approve Procedures For Interim Compensation For Professionals**

41.     The Debtor requests that the Court enter an order establishing a procedure for compensating and reimbursing professionals on a monthly basis.

42.     The Debtor filed applications to retain Berger Singerman and Kapila & Company. Further, I have been advised that in the event an official committee is appointed, that such committee could engage professionals whose approved fees are to be paid from the estate.

43.     The Debtor believes that monthly billing will assist the Court and parties-in-interest to effectively monitor the fees incurred, and the Debtor will be able to spread out payments of professional fees, rather than suffer larger depletions to its cash flows on an irregular basis.

**D.      Motion to Prohibit Utilities from Discontinuing Services on Account of Prepetition Invoices; (ii) Establish Procedures to Determine Requests for Additional Assurance of Payment; and (iii) Approve Deposits as Adequate Protection of Payment for Utility Services**

44.     The Debtor receive utility services from Ohio Edison. The Debtor seeks to (i) prohibit Ohio Edison from altering, refusing or discontinuing service on account of unpaid pre-petition invoices; (ii) deeming the Utility Deposit Account to provide Ohio Edison with adequate assurance of payment; and (iii) establish procedures for Ohio Edison to request additional adequate assurance of payment.

45.     The Debtor estimates that its average monthly payments to Ohio Edison on a postpetition basis will be approximately $3,500. To provide adequate assurance of payment for future services to Ohio Edison, the Debtor shall post a deposit in the amount of $4,000. This amount equals or exceeds the amount generally billed for one month of service.

46.     Uninterrupted utility service is essential to the ongoing operations of the shopping center. Should Ohio Edison refuse or discontinue service, even for a brief period, the

2739710-2

Debtor's business operations and those of its tenants would be severely disrupted. If such disruption occurred, the impact on the Debtor's business operations would be harmful and would jeopardize the Debtor's efforts to reorganize.

This concludes my declaration.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on April _16_, 2010.

_____
John R. McGill

2739710-2